**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**TAMAS ROTTENHOFFER,**

**Petitioner,**

**v.** **Civil No. 2:26cv589**

**AMANDA ROCHELLE ROTTENHOFFER,**

**Respondent.**

**OPINION AND ORDER**

The 1980 Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention") seeks to protect children "from the harmful effects of their wrongful removal or retention" from their country of residence. Hauge Convention, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89. "The United States has signed the Hague Convention as a contracting state and [Congress and the President] subsequently codified [our country's] obligations through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001, et. seq." Brandt v. Caracciolo, No. 22-2320, 2023 WL 7015680, at *2 (4th Cir. Oct. 25, 2023). Hungary is likewise "a contracting state to the Hague Convention." Id.

In the case pending before this Court, minor child M.R.'s father ("Petitioner") alleges that M.R.'s mother ("Respondent") improperly removed M.R. from the child's established residence in Hungary and has improperly retained M.R. in the United States since the summer of 2025. Though Respondent initially asserted that she

did not improperly remove or retain M.R., she later supplemented this assertion by arguing in the alternative that even if there was wrongful removal or retention, M.R. should not be returned to Hungary because doing so would create a "grave risk" of harm to M.R. or place the child in an "intolerable situation."

After a three-day expedited bench trial, it is clear to the Court that Petitioner and Respondent had a dysfunctional marriage marred by mistrust, verbal attacks, and physical altercations that at times rose to the level of spousal abuse. Both parties unfortunately have a history of allowing their emotions and mutual mistrust to take precedence over the psychological well-being of their minor child M.R., who was only 3 to 5 years of age during the most relevant period.

The trial record reveals that each parent has recognized the need for M.R. to have a genuine relationship with the other, but still, each parent has at times seized physical custody of M.R. and tried to severely limit the other parent's access to M.R. to only <u>supervised</u> visitation. Thankfully, even when the child has been improperly retained by one parent or the other, the Hungarian courts have continued to recognize the right of <u>both parents</u> to raise M.R.[1] Pursuant to the Hague Convention, this Court's role

[1] This Court trusts that, putting the child's interests first, a custody court would continue to recognize M.R.'s critical need for close contact and access to Respondent, M.R.'s mother, who has acted as M.R.'s primary caregiver before and after they traveled to the United States. Earlier this year, a Hungarian court made just this ruling. Pet'r Ex. 30, at 10.

does not allow it to decide matters of custody, with the Court instead limited to determining the proper venue for future custody proceedings.

As outlined below, Petitioner plainly demonstrates that Respondent improperly retained M.R. in the United States in violation of Petitioner's parental rights. Although Respondent has demonstrated that she was the victim of physical abuse while cohabitating with Petitioner (the cohabitation ended in the spring of 2023), and that M.R. witnessed some of this spousal abuse, there is no evidence that M.R. was ever physically abused by Petitioner. Nor does any historical spousal abuse occurring two years or more before M.R. left Hungary serve as compelling evidence that M.R. will face a "grave risk" of physical or psychological harm, or an otherwise "intolerable situation," if M.R. is returned to Hungary and reunited with Petitioner. Accordingly, for the reasons explained below, M.R. must be promptly returned to Hungary where child custody and child protection proceedings can be resumed.

**I. Hague Convention Background**

"Through the adoption of the Convention, the signatory nations, including [Hungary] and the United States, sought 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" Hazbun Escaf

v. Rodriquez, 200 F. Supp. 2d 603, 610 (E.D. Va. 2002) (quoting Hague Convention, preamble). "That is, the primary purpose of the Hague Convention is to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001) (quotation marks and citation omitted)). As the United States Supreme Court has expressly recognized, "[t]he Convention's core premise is that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." Golan v. Saada, 596 U.S. 666, 670 (2022) (citation modified).

Based on such framework, a district court's inquiry under the Hague Convention is a limited inquiry that focuses on the "merits of the abduction claim" and not "[t]he merits of any underlying custody case [which] are not at issue." Miller, 240 F.3d at 398 (citation omitted); see Golan, 596 U.S. at 680-81 ("The Convention and ICARA prohibit courts from resolving any underlying custody dispute in adjudicating a return petition." (emphasis added)) (citing Hague Convention art. 16; 22 U.S.C. § 9001(b)(4)).

Stated a little differently, "[t]he Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings." Monasky v. Taglieri, 589 U.S. 68, 72 (2020) (emphasis added); Golan, 596 U.S. at 671. Thus, when a petitioner meets his burden to demonstrate that a minor child was wrongfully

removed or retained, "the country to which the child has been brought," here the United States, "generally must order the prompt return of the child." Alcala v. Hernandez, 826 F.3d 161, 169 (4th Cir. 2016) (citing Abbott v. Abbott, 560 U.S. 1, 9 (2010)). The return remedy is not, however, absolute as there are a "limited number of narrow exceptions to the general rule of return." Id.

Because the return remedy is provisional, and because it is important to "avoid delaying the custody proceeding," Monasky, 589 U.S. at 72, the Convention "requires courts to resolve return petitions 'us[ing] the most expeditious procedures available,'" Golan, 596 U.S. at 682 (quoting Hague Convention art. 2) (alteration in original). In light of such dictate, here, the Court ordered expedited discovery and an expedited evidentiary hearing that was conducted approximately two months after the amended petition was filed.[2]

## II. Findings of Fact

Based on the testimony and exhibits presented at trial, the Court makes the following factual findings.

[2] The Court initially envisioned an expedited one-day evidentiary hearing. However, due to the scope of Respondent's evidence, the in-court proceeding is best characterized as a three-day bench trial. Respondent proceeded pro se at the bench trial, but even without a lawyer's assistance, she secured experts, proffered substantial documentary and video evidence, and advanced a thoughtful and thorough defense advocating for her position.

**Parties**

Petitioner is a Hungarian citizen who lived in Hungary from at least 2020 through the date of the bench trial. Respondent is an American citizen who lived in Hungary from at least 2020 through June 2025 and who currently lives in the United States. Petitioner's extended family resided in Hungary during the relevant time period and M.R. had regular contact with them prior to the summer of 2025. Respondent's extended family resided in the United States during the relevant time period, though Respondent testified at the bench trial that she no longer has a good relationship with her family.

**December 2019 - May 2023**

Respondent and Petitioner were married in December 2019. M.R. was born in Hungary in July 2020 and is a dual citizen of Hungary and the United States. Respondent and Petitioner resided together in Hungary from the time they were married through the spring of 2023. During this time, they had multiple verbal and physical altercations, and over the years, Respondent retained photographs chronicling what she asserts was ongoing spousal abuse. Resp't Ex. 7b. At trial, Respondent presented credible evidence demonstrating that M.R. witnessed many spousal altercations and at least some specific instances of physical abuse. However, while Respondent introduced numerous photos that she claims are the result of spousal abuse occurring prior to the fall of 2023, the

purported abusive acts were generally not explained by Respondent, nor was it always clear whether M.R. was present.

Petitioner has repeatedly denied intentionally harming or abusing his wife and has made such denials in prior Hungarian proceedings and under oath at the bench trial in this Court. Petitioner did acknowledge in his sworn testimony that some of Respondent's bruises or similar injuries were caused when he defensively squeezed her hands or otherwise sought to end an altercation. The fact that he caused some of Respondent's injuries can also be inferred from Petitioner's contemporaneous text messages. Id. Petitioner maintains, however, that he only acted in self-defense, including instances when Respondent struck him, or when he forced his way out of a room after being cornered by Respondent. Petitioner offered no explanation for certain injuries highlighted by Respondent, beyond awkwardly noting the possibility that Respondent injured herself or bumped into things.[3] He did assert that Respondent had admitted in prior Hungarian proceedings that certain physical injuries were not caused by abuse, but such broad statement did not effectively rebut the universe of Respondent's photographed injuries.

[3] The Court observed that English is clearly not Petitioner's native language, but he testified competently and clearly in English, though haltingly at times.

The Court does not find most of Petitioner's testimony on this topic to be credible.[4] Rather, Respondent's testimony as supported by contemporaneous evidence effectively demonstrates that she was verbally and physically abused by Petitioner on more than one occasion between December 2019 and the spring of 2023. In the face of the evidence against him, the Court views Petitioner's continued denial of <u>any</u> physical abuse on <u>any</u> occasion to be troubling.

While Respondent demonstrated that she was the victim of verbal and physical abuse while cohabitating with Petitioner, the Court also finds that Respondent was verbally abusive toward Petitioner during their period of cohabitation. The Court further acknowledges the possibility that it was Respondent who instigated some physical altercations with Petitioner.[5]

In contrast to the parties' inter-spousal verbal and physical altercations, consistent with her position in Hungarian judicial proceedings, Respondent does <u>not</u> allege that Petitioner ever physically abused M.R. In fact, in May 2023, she expressly stated

---

[4] One fact witness, a friend of Respondent, testified that she remembered seeing bruises and marks on Respondent that were, in her view, evidence that Petitioner had held Respondent too strongly. This portion of the witnesses testimony is not inconsistent with Petitioner's version of events.

[5] Petitioner's testimony and other trial exhibits support the finding that Respondent was verbally abusive toward Petitioner. As to physical abuse, Petitioner testified to such fact, and a video exhibit played at trial creates at least an inference that Respondent resorted to physical violence. In the video, after walking away from Petitioner and throwing aside a large kitchen knife that she was carrying, Respondent turns toward Petitioner and angrily slaps the recording device out of his hand. Pet'r Ex. 45.

in her complaint to Hungarian police about spousal abuse that Petitioner "has never intentionally abused M.R.," though she asserted that he did pull the child forcefully off her lap on more than one occasion causing M.R. bruises.[6] Resp't Ex. 8c.

Respondent has both alleged and effectively demonstrated that Petitioner physically harmed her while M.R. was present, which harmed M.R. emotionally. It is also readily apparent that Petitioner's and Respondent's ongoing mistreatment of each other in the family home occurred in M.R.'s presence and caused M.R. emotional harm.

Turning to the specific event that led to the parties ending their cohabitation, on May 20, 2023, Petitioner and Respondent started a heated argument in their home that led to a physical altercation causing Respondent significant injuries, including a bloodied nose and an injured elbow. As a result of this altercation, Respondent secured a 30-day Hungarian "preventive restraining order" against Petitioner. Criminal charges were also pursued in Hungary, but the criminal investigation was terminated, apparently due to conflicting evidence.

[6] Some trial testimony suggested that Petitioner was verbally harsh with M.R. and seemed to get unduly upset and scold the child over small things. But even if this is accepted as true, the testimony does not suggest that Petitioner's parenting of M.R. is appropriately labeled as "verbal abuse."

A review of translated Hungarian documents introduced at the bench trial reveals such conflicts.[7] On the same day as the altercation, Respondent reported to Hungarian police that the couple had a verbal argument that devolved into a physical struggle over house keys. During the struggle, Petitioner put his fingers in Respondent's mouth and she reacted by biting him in self-defense. As Respondent reported on the day of the altercation, Petitioner also "struck her once in the face," Pet'r Ex. 44, at PET0345, "causing [her] nose to bleed," Resp't Ex. 8c.

The hearing minutes from the restraining order proceeding held three days later, on May 23, 2023, reflect some differing facts. There, Respondent indicated that after she bit Petitioner, the arm of the chair she had fallen onto broke, causing her to fall further onto the floor; when she hit the floor, a large amount of blood started pouring from her nose. Resp't Ex. 8i, at 4. Respondent's own exhibit at the bench trial indicates that she affirmatively stated during the Hungarian proceeding that Petitioner "did not punch [her] in the nose," but that "somehow, during the chaos, [her] nose was injured." Id. Respondent also initially stated at the Hungarian hearing that Petitioner had "tried to choke [her] as he put his finger into [her] mouth," id., though she had previously told the police that she did "not know

[7] Both parties submitted multiple translated Hungarian documents into evidence during the expedited bench trial and neither party raised any objection challenging the accuracy of any of the translations.

what his intention was," Resp't Ex. 8c. When the Hungarian judge followed up on this later in the proceeding, Respondent stated that although Petitioner had put his finger in her mouth in the past, she "cannot rule out that it happened accidentally during the struggle." Resp't Ex. 8i, at 7.

In the 2023 ruling imposing the preventive restraining order, the presiding judge concluded as follows: (1) Petitioner had ordered Respondent to hand over the keys and warned that he would take them if she did not comply; (2) Respondent refused, so Petitioner repeatedly tried to take the keys from different angles using "physical force" that led to a "mutual physical struggle"; (3) after Respondent fell onto a chair and pleaded with Petitioner to stop, Petitioner continued trying to pull the keys from her hand, during which time one of his fingers ended up in her mouth and she bit him; (4) Petitioner ultimately obtained the keys, though during the struggle, Respondent fell from the chair, and after falling to the floor, Respondent "noticed that blood was flowing from her left nostril"; and (5) M.R. was present throughout the physical altercation. Id. at 10-11.

Consistent with the factual findings recounted above, the Hungarian judge ordered a 30-day preventive restraining order, finding that Petitioner's conduct "seriously and directly endangered [Respondent's] dignity and her physical and mental health, as well as the mental health of their minor child." Id.

at 11. Though conflicts between the initial report to police and the facts found at the protective order proceeding may have led to the termination of criminal charges requiring a higher burden of proof, this Court (based on evidence presented in this proceeding) agrees with the Hungarian judge's findings and easily concludes that Petitioner physically abused (though did not punch) Respondent on May 20, 2023.

Following the issuance of the 30-day restraining order, Petitioner temporarily moved out of the family home. He was later found to be in violation of the restraining order and was ordered to pay a fine after his presence at the family home was captured on video. Petitioner admits his violation, but contends that he did not initially understand that he was barred from the house even when no one was home, claiming that he was present only to retrieve belongings he needed for work. The relevant facts confirm that Petitioner attempted to access the home in a manner that would avoid improper contact with Respondent or M.R. There is also no evidence demonstrating that Petitioner attempted to abuse Respondent or to contact M.R. while the short-term restraining order was in place.

**June 2023 - February 2024**

Following the incident of May 20, 2023, the parties separated. Custody of M.R. in the immediate aftermath of their separation appears to have been largely with the mother through an informal

arrangement. No other physical abuse is alleged to have occurred after the summer of 2023, with the exception of a custody "hand off" at a train station in November 2023 when Petitioner allegedly grabbed Respondent's arm with enough force to cause a bruise while in the presence of her boyfriend.

In late August and early September of 2023, Petitioner kept the child away from Respondent for five weeks, purportedly because he was frustrated that he was not receiving equal time with M.R. under the informal custody arrangement. During this time, Petitioner kept M.R. out of the preschool M.R. attended, where Respondent was also employed.

In November of that same year, Respondent appears to have behaved similarly, keeping M.R. away from Petitioner for three weeks. Resp't Ex. 10c, at 11. Shortly thereafter, Petitioner improperly kept the child from Respondent for much longer. Characterized as a "kidnapping" by Respondent, Petitioner kept M.R. from December 8, 2023, until mid-February 2024. During this time frame, and as part of their ongoing divorce case, Respondent obtained a temporary Hungarian custody order providing that M.R. would spend slightly more time with Respondent than with Petitioner.[8] Pet'r Ex. 26. The temporary custody order, dated January 18, 2024, also required Petitioner to return M.R. to

[8] At trial, the custody arrangement was described as a 60/40 split, though the precise percentages are immaterial to this Hague proceeding.

Respondent within 48 hours, id., though Respondent testified at the bench trial that the order did not take effect until mid-February. Respondent acknowledges that, when the order took effect, Petitioner complied with the 48-hour turnover requirement.

**February 2024 - June 27, 2025**

From February 2024 until June 27, 2025, it appears that Petitioner and Respondent continued to mistrust each other and continued to have verbal disagreements over various matters regarding M.R.'s life in Hungary, including which kindergarten M.R. should attend and whether M.R. should be free to travel to the United States with Respondent for vacation, among other things. At no time, however, was any more physical abuse alleged. Additionally, Respondent did not present any evidence suggesting that Petitioner improperly retained M.R. after the Hungarian custody order took effect, with the exception of him delivering M.R. late for exchanges at M.R.'s school.[9] The Court's general impression of the parties' conduct during this time is that they could agree on little and continued to have a contemptuous relationship founded on deep suspicions of the other's intentions.

Hungarian authorities made similar factual findings, both before and during this period. In an order issued in January 2024,

[9] Respondent testified that Petitioner's visitation deadline was 8:00 a.m. but that he often dropped M.R. off at school closer to 10:00 a.m., the time that school started. While this testimony was credible, this conduct does not evidence a material disregard of court orders so as to raise concerns about M.R.'s safety if ordered returned to Hungary and reunited with Petitioner.

a Hungarian court warned the parties "that, for the sake of their child's calm and balanced emotional and psychological development, they should set aside their hostility toward one another, because if they continue to relate to each other in this manner in the future, it will indicate their parental unfitness and [] irresponsibility . . . ." Pet'r Ex. 26, at 10. Approximately one month later, on February 22, 2024, the Hungarian Guardianship Authority conducted a child protection hearing regarding M.R. The hearing minutes review the physical abuse of Respondent on May 20, 2023, and the preventive restraining order that followed, and state that Respondent was working with the Guardianship Authority to obtain psychological counseling for herself and M.R. Resp't Ex. 10c, at 10. The minutes also reference the post-separation conflicts in the parents' relationship, including both parents' prior failures to turn the child back over to the other. See id. at 11 (reflecting Respondent's statement that she kept the child for three weeks in November 2023; Petitioner, as noted above, twice did the same for longer in the late summer and winter of 2023).

Three months later, on May 23, 2024, the Guardianship Authority issued its decision ordering child protection for M.R. and ordering the parents to participate in psychological counseling and to "refrain from all forms of verbal and physical aggression toward one another." Resp't Ex. 10d, at 2. The decision recapped the relevant history, and included references to

a "pedagogical opinion" from M.R.'s kindergarten, dated November 25, 2023 (after the parties' separation and after Petitioner had withheld M.R. from Respondent the first time). The account from M.R.'s school states as follows:

> [M.R.] always arrives at kindergarten clean and no external signs of neglect are visible. . . . We have a good relationship with [M.R.'s] mother, as she is one of our colleagues. At the end of September we met [M.R.'s] father . . . [and] have remained in regular contact with both parents. We believe that both parents wish to cooperate and participate in [M.R.'s] development; however, they are not being completely honest about their current situation. . . . We emphasize that [M.R.] needs stability in order to develop appropriately. To achieve this, we recommend that [M.R.] always be informed in advance whether [the child's] mother or [the child's] father will pick [M.R.] up. It is important that the parents speak positively about one another in [M.R.'s] presence and in no way influence [M.R.] negatively against either parent. We consider the relationship between the parents to be positive. [M.R.] shows affection toward [the] mother and is always happy to greet her when [M.R.] sees her in the building. Likewise, we observe that [M.R.] has a loving relationship with [the] father and is excited and happy whenever he comes to pick [M.R.] up from kindergarten.

Id. at 5.

The Guardianship Authority went on to recite findings of the Hungarian Human Service Center ("the Center"), which carried out case management duties. In the Center's view,

> the principal problem affecting the functioning of the family is the ongoing conflict between the parents, because – according to mother's statement – the marriage had been continuously characterized by abuse and conflict during the previous four and a half years. She stated that the child witnessed the last incident of abuse. Thereafter, M.R. was afraid to sleep alone, suffered from nightmares, and experienced night terrors.

Id. This Court finds similarly after considering the totality of the evidence presented at the bench trial, which demonstrated that (1) "abuse and conflict" during the parties' cohabitation caused or contributed to M.R.'s emotional problems; and (2) that Petitioner was primarily, if not solely, responsible for any physical abuse.

However, notwithstanding these findings, the trial record still reveals that by the spring of 2024, one year after the parties ended their cohabitation, the Guardianship Authority and the Center had effectively secured resources to assist in M.R.'s recovery. Notably, the Guardianship Authority's findings observe:

> [T]he relationship between the parents of the minor [M.R.] is burdened by serious conflict . . . . The conflict between the parents on several occasions escalated into loud verbal disputes, and in one instance escalated into verbal aggression involving insults to each other's dignity and rights, during which [Respondent] sustained personal injuries.[10] These events which occurred repeatedly and in which both parties participated, have had a seriously detrimental effect on the child's emotional development and behavioral difficulties — also identified by the child welfare professionals — have already appeared in the child.
>
> In view of all these circumstances, . . . both parents [were ordered to] receive psychological assistance, since . . . resolving the underlying causes and achieving appropriate communication and behavior toward each other

---

[10] The Guardianship Authority concluded that the repeated arguments resulted in Respondent being injured in "one instance." This Court, however, concludes that disputes devolving into intentional physical violence occurred on more than one occasion. The Court, however, notes that not every historical photograph of a bruise or injury submitted by Respondent is compelling evidence of intentional physical abuse. But Respondent's evidence, considered cumulatively and in the face of Petitioner's less than credible responsive testimony, sufficiently demonstrates more than one instance of physical abuse during their marital cohabitation.

> require outside professional assistance. The parents also endangered the child by making it unpredictable for the child which parent's care [M.R.] would be in during the coming days, even though — as described in the education opinion concerning the child — the child has a strong need for stability.
>
> Both parents, individually, strive to provide the conditions necessary for the child's development, and during the proceedings no factor endangering the child was identified in either parent's care of [M.R.] The child loves both parents, and a relationship exists with both of them.
>
> Considering the conflictual relationship between the parents, their inadequate communication with one another, and their lack of cooperation, all of which significantly endanger the healthy physical, emotional and moral development of the minor [M.R.], . . . the child [was placed] under protection.

Id. as 12 (emphasis added).

In addition to the record demonstrating that the child loves both parents, the record unquestionably demonstrates that both parents love the child. An audio recording of the July 2023 conversation when Respondent informed Petitioner that she wanted a divorce, recorded without Petitioner's knowledge, clearly reveals Petitioner's genuine love for M.R. and his fear that he would lose M.R. in the divorce. Resp't Ex. 7a, at 30:05 - 32:25. During the recorded conversation, Respondent immediately acknowledged Petitioner's love for M.R. and assured Petitioner that he was not going to lose M.R. Id.

Following the issuance of the Guardianship Authority's ruling, the parties continued to share custody of M.R. while living separately. The parties' disputes over M.R.'s schooling and other

matters endured, and Petitioner continued to fear that Respondent would take M.R. and flee to the United States. This fear, regardless of whether it was founded on objective facts or unfairly motivated by speculation and distrust, caused Petitioner to (1) unsuccessfully seek legal relief in Hungary that would bar M.R. from international travel with Respondent, and (2) refuse to sign paperwork renewing M.R.'s Unites States passport during the first half of 2025. M.R.'s Hungarian passport had already expired at that time, and [M.R.]'s U.S. passport was expiring near the end of the summer.

**June 27, 2025 - present**

On June 27, 2025, Respondent and M.R. traveled to the United States without first notifying Petitioner of their specific travel plans. Since that trip began, Respondent has consistently asserted that the travel to the United States was not a pre-planned permanent move, but was instead a short-term vacation to visit friends consistent with numerous prior short-term vacations to the United States.

It is undisputed that M.R. and Respondent traveled to the United States on one-way plane tickets. Further, the record demonstrates that before the trip, Respondent sold her furniture and other personal belongings, ended her apartment lease in Hungary, and concluded her job as a Hungarian kindergarten teacher. However, after a full opportunity to present his evidence at trial,

and in the face of Respondent's explanations for each of these suspicious actions, Petitioner fails to convince the Court that Respondent left Hungary with the intent to remain permanently in the United States.

First, Respondent and Petitioner had been jointly contemplating a move to the United States and Respondent shared this plan with her Hungarian landlord in text messages discussing ending her lease. Pet'r Ex. 18. Such plan fell through when Petitioner changed his mind, leaving Respondent to chart a new course.

Second, while Respondent clearly lacked a pre-established plan for a future life in Hungary beyond a stated intent to rent a furnished apartment upon her return, there is likewise no evidence suggesting that Respondent made any advanced arrangements in the United States indicative of an intent to remain. For example, there is no evidence suggesting that Respondent secured housing in the U.S., and she was instead temporarily staying with a friend who had so little room that M.R. and Respondent had to share a bed when they stayed with her. Similarly, there is no evidence suggesting that Respondent had taken any steps to arrange employment in the United States.

Third, numerous emails exchanged between Petitioner and Respondent in the days after Respondent left Hungary demonstrate her initial inability to return to Hungary due to M.R.'s soon-

expiring U.S. passport. Pet'r Ex. 2. The Court finds that these emails, as well as other contemporaneous exhibits, credibly support Respondent's genuine efforts to secure the renewed U.S. passport so that she could return to Hungary with M.R.

The Court does recognize the possibility that Respondent knew before her trip that M.R. could not return to Hungary with a U.S. passport that was expiring in less than six months, and she may have used her vacation as a means to pressure Petitioner to approve the renewal as he had refused to do in the months preceding her vacation. However, even assuming without deciding that she had a pre-planned motive to secure an updated U.S. passport, such scheme does not undercut the transitory nature of the planned vacation, and does not demonstrate an intent to carry out a permanent move as of June 27, 2025, or in the months immediately thereafter.

Consistent with the parties' contemptuous history, once Respondent was in the United States with M.R., both Respondent and Petitioner dug in their heels regarding the best method to return M.R. to Hungary. Petitioner, mistrusting that Respondent and M.R. would return at all if he approved a U.S. passport, refused to renew M.R.'s U.S. passport and instead insisted that M.R. return home using a temporary Hungarian travel document. Later, Petitioner agreed to renew M.R.'s U.S. passport and placed a signed renewal document in escrow in Hungary, though he insisted that Respondent physically return to Hungary to retrieve it.

Respondent, for her part, refused to utilize a Hungarian temporary travel document, mistrusting Petitioner's representation that he would renew the U.S. passport if M.R. returned. Given her distrust of Petitioner and the history of abuse, Respondent feared that M.R. would become "trapped" in Hungary without an ability to travel back to the United States. At trial, Respondent credibly testified that, in her view, she was not <u>refusing</u> to return to Hungary during the summer and early fall of 2025, but was very uncomfortable returning without a new U.S. passport for M.R.

With Petitioner and Respondent electing not to bend to the other's demands, Respondent and M.R. remained in the United States. In August, Petitioner initiated a Hague Convention complaint causing the U.S. Department of State to send Respondent a voluntary return letter, dated September 5, 2025. Pet'r Ex. 5. Such letter notified Respondent that Petitioner was seeking M.R.'s return and indicated that if a solution was not reached in the near term, the State Department would have to continue processing the application and facilitate the initiation of judicial proceedings. <u>Id.</u>

On September 19, 2025, Respondent timely responded to the State Department's voluntary return letter. Pet'r Ex. 6. In her responsive email, Respondent explained that she had not wrongfully removed M.R. from Hungary, but instead merely took a vacation during her regular parenting time.[11] <u>Id.</u> at 1. She then blamed

[11] Although Petitioner has taken the position, before and after M.R.'s

her inability to return on Petitioner's lack of cooperation, noting that a short-term travel document would "effectively entrap" M.R. in Hungary. Id.

Respondent testified at trial that she still intended to return to Hungary when she sent this email, and it was not until December 2025 that she firmly decided to stay in the United States. At that point, Respondent reports, (1) she had established Virginia residency and M.R. was in the middle of a school year; (2) Petitioner's emails revealed that he was upset and trying to control her, making her fearful to return; and (3) Petitioner had requested a change in custody in Hungary that would restrict Respondent to only supervised visitation. Respondent, as M.R.'s long-term primary caregiver, appropriately claims that Petitioner's attempt to strip her of virtually all custody rights was not in M.R.'s best interest, though it bears mentioning that Respondent herself had sought the same relief during the winter of 2023. Pet'r Ex. 26, at 4.

In February 2026, a Hungarian appellate court ordered Respondent "to hand over the child . . . to [Petitioner] within 30 days at his address" in Hungary. Pet'r Ex. 30, at 1. The ruling

---

removal, that it was unlawful for Respondent to travel with M.R. to the United States without his "permission," a 2026 opinion from a Hungarian appellate court may indicate otherwise. See Pet'r Ex. 30, at 8 ("Both the custodial parent and the parent entitled to the maintenance of the contact have the right to travel abroad with the child for the purpose of visiting relatives or holiday.").

went on to note that there was "no obstacle for [Respondent] to travel home with the child," and that a "provisional passport can be obtained at any time with the declaration signed by [Petitioner]." Id. at 3. The appellate court then recapped Petitioner's legal efforts to effectuate M.R.'s return, including filing a "request for a provisional measure" regarding custody rights on September 11, 2025, which he then "withdrew in the hope of voluntary return." Id. at 6. When Respondent did not return with M.R., Petitioner submitted "another request for a provisional measure" in mid-October. Id.

The Hungarian appellate court concluded that Respondent was "obligat[ed] to return the child to [M.R.'s] habitual residence following a foreign vacation" and that she "may not make the fulfilment of this obligation conditional." Id. at 8. Respondent, therefore, was deemed to be in violation of the provisional custody order in place at the time she left, having "completely obstruct[ed] the exercise of the child's right to maintain contact with the other parent in the context of personal visitation." Id. Reiterating the parties' joint responsibility to prioritize M.R.'s interests, the court stated that "based on the data of the lawsuit, both parties exhibited conduct contrary to the child's best interests." Id. at 9.

With respect to Petitioner's request to materially change the custody arrangement, the appellate court appropriately

questioned Respondent's judgment and found that (1) "no definitive conclusion" could be reached based on the current state of the record, and (2) the custody order should be temporarily modified so that the "60/40" arrangement was flipped, assigning the father primary custody. Id. Importantly, the court addressed and rejected Petitioner's request to limit Respondent to only supervised visitation with M.R., finding as follows:

> [T]he child had been raised and cared by both parents since [] birth, the child had been living with [Respondent] for months, therefore, it is [in] the child's best interest to keep spending time with [Respondent] on a regular, extensive, and predictable basis. Based on evaluating the available data of the lawsuit, the [appellate court] therefore principally authorized [Respondent] to maintain contact with the child for the duration to which [Petitioner] was entitled under [the prior custody order].

Id. at 10.[12]

After being ordered to turn the child over within 30 days, and despite learning that she would, at least temporarily, retain extensive custody rights in Hungary, Respondent elected to remain with M.R. in the United States. At the bench trial in this Court, Respondent testified that she did so based on her subjective fear

---

[12] This and prior excerpts quoted from Hungarian proceedings are not recited based on a finding that this Court is bound by them as any sort of "law of the case." See Miller, 240 F.3d at 402 (noting that "deference to the New York family court was not, in fact, required, though the district court possessed discretion to 'take account of the reasons' for the New York Order in appraising the merits of Miller's asserted defense" (quoting Hauge Convention art. 17)). Rather, except as otherwise noted, this Court finds that the information recited from Hungarian authorities is a credible account of past events after this Court considers the entirety of the testimony and evidence introduced during the three-day bench trial.

of returning and on the advice of counsel. The Court finds this statement to be credible with one limitation. While the Court accepts that Respondent was sincerely fearful of losing access to M.R. if she returned, it rejects Respondent's suggestion that Petitioner's tone in his emails in the fall of 2025, or his other recent conduct, was abusive or controlling to a degree suggesting a credible risk of harm to M.R. if they returned.

Focusing on the purported "risk" upon return, this Court fully accepts as credible Respondent's representations throughout this litigation that, as of July 2025, she was willing to return to Hungary to co-parent M.R. from a residence separate from Petitioner as long as she received a renewed U.S. passport for M.R. The fact that Petitioner sent numerous emails to Respondent and pursued multiple legal avenues to secure the return of his minor child to Hungary in the fall of 2025 is neither surprising nor concerning. In fact, the Court expects that Respondent would have followed a similar course if she found herself in Petitioner's shoes.

After Respondent failed to comply with the Hungarian appellate court's return order, Petitioner filed the instant suit seeking a return order pursuant to the Hague Convention. ECF No. 1. This lawsuit was initiated less than one year after Respondent and M.R. left Hungary.

## III. Conclusions of Law

### A. Issue One - Wrongful Removal or Retention

#### 1. Standard

The threshold question before the Court is whether M.R. was wrongfully removed from Hungary or wrongfully retained in the United States. To prevail on his claim of wrongful removal or retention, Petitioner must prove by a preponderance of the evidence that (1) M.R. was "habitually resident" in Hungary immediately prior to the child's removal or retention, (2) the removal or retention "was in breach of [Petitioner's] custody rights" under Hungarian law; and (3) Petitioner "had been exercising those [custody] rights at the time of removal [or retention]." Bader v. Kramer, 484 F.3d 666, 668 (4th Cir. 2007); see 22 U.S.C. § 9003(e)(1)(A) (providing for the preponderance burden of proof). Respondent does not dispute that M.R. was habitually resident in Hungary in the summer of 2025, nor does she dispute that Petitioner was exercising his custody rights at that time. With these concessions, each of which is amply supported by the record, the sole issue is whether Respondent wrongfully removed or retained M.R.

"Generally speaking, 'wrongful removal' refers to the taking of a child from the person who was actually exercising custody of the child. 'Wrongful retention' refers to the act of keeping the child without the consent of the person who was actually exercising

custody." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, at 10503, 1986 WL 133056 (Mar. 26, 1986). Importantly, despite the frequent use of the words "wrongful," "abduction," or "kidnapping" in Hague Convention cases, a petitioner is not required to prove that a respondent had the specific intent to break the law to prove "wrongful" removal or retention. Rather, the focus is on whether parental rights were violated. "Because it is undisputed in this case that [Hungary] was the child's habitual residence before [M.R.'s] removal, [Hungarian] law determines whether there was a breach of [Petitioner's custody] rights." White v. White, 718 F.3d 300, 303 (4th Cir. 2013) (citing Hague Convention, art. 3(a))).

**2. Discussion**

Incorporating the factual findings above, Petitioner falls short of demonstrating wrongful removal, but has demonstrated wrongful retention by a preponderance of the evidence. The Court finds Respondent to be credible in her testimony, as supported by exhibits, as to her longstanding claim that she intended to return M.R. to Hungary notwithstanding her lack of an established plan for the future (no return plane ticket, no long term residence, no employment). Tellingly, Petitioner had no long-term residence or employment arranged in the United States either, and she had close friends in both countries willing to help her and M.R.[13] As

---

[13] Earlier this year, the Hungarian appellate court appeared to conclude

previously noted, the Court acknowledges the possibility that Respondent had planned to leverage her vacation as a means to pressure a reluctant Petitioner to sign passport renewal documents, but even if this occurred, it does not equate with a plan to relocate to the United States or to withhold M.R. from Petitioner beyond her custodial summer vacation. While not certain, it is more likely than not that when Respondent left Hungary, she planned to return with M.R. in July 2025.

Notwithstanding the above analysis of wrongful removal, Petitioner plainly demonstrates that Respondent wrongfully retained M.R. in the United States. In the dispute over the passport renewal, Respondent refused to return to Hungary without her preferred travel document for M.R. While this conduct is understandable based on her subjective concerns, it was simply not permitted under Hungarian custody rules. Petitioner had then, and still has today, valid custodial rights of physical access to M.R., and Respondent's unilateral actions prevented him from exercising those rights. Petitioner has demonstrated that Respondent's wrongful retention began on or around July 16, 2025, when

---

that the circumstantial evidence surrounding Petitioner's departure suggested that she never intended to return to Hungary, or at a minimum, that she was aware before the trip that M.R.'s expiring passport would prevent M.R.'s return. Pet'r Ex. 30, at 9. However, the Hungarian courts were prevented from conducting a searching review of all relevant facts due to Respondent's absence. For example, the fact that Respondent scheduled several passport appointments for Petitioner before she left Hungary may not prove knowledge of an inability to return and could instead simply reflect the continuation of her months-long effort to renew M.R.'s passport.

Respondent unequivocally rejected a "temporary passport" as "not a suitable alternative when a long-term solution is readily available and in [M.R.'s] best interest." Pet'r Ex. 2, at 22. This action represents a decision to remain; that is, Respondent could have returned M.R. to Hungary, but chose not to.

Alternatively, Respondent's wrongful retention could be dated to around September 19, 2026, when she responded to the Hague Convention voluntary return letter by indicating that "[f]or [M.R.'s] safety, [she] could not accept a short-term travel document that would effectively entrap [M.R.] in Hungary." Pet'r Ex. 6. Though the Court does not question that Respondent subjectively believed that she was championing M.R.'s interests, she was again electing to remain in the United States unless Petitioner capitulated to her passport renewal demands, and she offers no lawful basis for such actions. Even assuming that Petitioner was behaving improperly under Hungarian law by failing to facilitate the renewal of M.R.'s U.S. passport, Respondent herself needed to utilize the Hungarian courts to pursue relief from any misconduct on his part, not leverage international borders as an excuse to retain the child. Petitioner has therefore convincingly demonstrated "wrongful retention" by a preponderance of the evidence.[14]

---

[14] As yet another alternative date, the retention plainly was "wrongful" after the Hungarian appellate court's February 2026 return order took effect.

### B. Issue Two - Narrow Exceptions to Ordering Return

#### 1. Standard

After a petitioner proves wrongful removal or retention, a court must order the child's return unless a respondent can prove the applicability of one of "a limited number of narrow exceptions to the general rule of return." Alcala, 826 F.3d at 169 (citing Miller, 240 F.3d at 398-99, 402). Relevant here, Respondent asserts that "there is a grave risk that [M.R.'s] return [to Hungary] would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b).

Under ICARA, Respondent bears the burden of proving the applicability of the limited Article 13(b) exception by "clear and convincing evidence." Golan, 596 U.S. at 672 (quoting 22 U.S.C. § 9003(e)(2)(A)); see Nowlan v. Nowlan, 543 F. Supp. 3d 324, 363 (W.D. Va. 2021) ("The grave risk exception is to be interpreted narrowly, lest it swallow the rule." (quoting Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007))). If Respondent can satisfy this elevated statutory burden, the Court may be excused from ordering M.R.'s return to Hungary. Lozano v. Montoya Alvarez, 572 U.S. 1, 5 (2014). However, even if the exception is proven, the Court retains authority to order M.R.'s return, and has discretion "to consider [imposing] ameliorative measures that could ensure the child's safe return." Golan, 596 U.S. at 678.

"Courts examining the Article 13b exception for grave risk of harm to the child generally look to the risk of physical or psychological harm that might be inflicted on the child by the person to whose custody the child would be returning." Hazbun Escaf, 200 F. Supp. 2d at 613 (footnote omitted); see Sanchez v. Sanchez, No. 1:18cv449, 2021 WL 1227133, at *27 (M.D.N.C. Mar. 31, 2021) ("[T]he Article 13b inquiry must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence." (quoting Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 378 (8th Cir. 1995))). Article 13b, however, is "not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests," as that remains a function of a custody court. Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) (quoting Public Notice 957, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986)).

"Although there is no clear definition of what constitutes 'grave risk,' the respondent 'must show that the risk to the child is grave, not merely serious.'" Luis Ischiu v. Gomez Garcia, 274 F. Supp. 3d 339, 350 (D. Md. 2017) (quoting Friedrich, 78 F.3d at 1068). Multiple federal circuit courts, as well as commentators and courts from other nations, have described the "grave risk" standard as requiring a degree of "harm that is something greater than would normally be expected on taking a child away from one parent and passing him to another; otherwise, the goals of the

Convention could be easily circumvented." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000); see, e.g., Friedrich, 78 F.3d at 1068 (same); Madrigal v. Tellez, 848 F.3d 669, 676 (5th Cir. 2017) (same); James D. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges, at 133-34 (FJC 3d ed. 2023) (reciting the same standard and noting that "[f]indings of grave risk are rare"). Determining the gravity of a risk is incredibly fact-intensive and requires weighing "not only the probability of harm, but also the magnitude of the harm if the probability materializes." Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005); cf. West v. Dobrev, 735 F.3d 921, 931 (10th Cir. 2013) (indicating that a high probability of harm is required and that the magnitude of the potential harm "must be severe" (quoting Souratgar v. Lee, 720 F.3d 96, 103 (2d Cir. 2013)).

Consistent with the limited nature of a Hague Convention case aimed at deciding the forum for future custody proceedings, district courts faced with an Article 13(b) defense are "not permitted to determine whether one parent would be better than the other, or whether the environment offered by Respondent is superior to the[] home environment" in the child's country of habitual residence. Alcala v. Hernandez, No. 4:14cv4176, 2015 WL 4429425, at *15 (D.S.C. July 20, 2015). Along these same lines, when assessing the psychological impact of a child's adjustment back to

the pre-removal setting, a party invoking the limited 13(b) exception cannot rest on the fact that a wrongfully removed child will face challenges "associated with uprooting and moving . . . back to the country of habitual residence." Ischiu, 274 F. Supp. 3d at 350. Otherwise, a removing parent could undermine the purposes of the Convention by "abduct[ing] a child and then – when brought to court – complain[ing] that the child has grown used to the surroundings to which they were abducted." Id. (quoting Friedrich, 78 F.3d at 1068). Stated another way, "[u]nder the logic of the Hague Convention, 'it is the abduction that causes the pangs of subsequent return.'" Vite-Cruz v. Sanchez, 360 F. Supp. 3d 346, 357 (D.S.C. 2018) (quoting Friedrich, 78 F.3d at 1068).[15]

The concept of an "intolerable situation" is similarly hard to define categorically as it must be applied across a wide array of differing familial circumstances. Like the "assessment of the evidence relating to grave risk," considering whether there is an intolerable situation "depends significantly on the credibility of the witnesses." Ischiu, 274 F. Supp. 3d at 351. One easily identifiable "example of an intolerable situation is one in which

[15] The Convention does recognize that when a non-removing parent sleeps on his rights and does not seek to enforce return within one year, a child's "well-settled" status may be a legal defense to return. Hague Convention art. 12. However, here, such exception is inapplicable by its terms as Petitioner filed this Hague Convention case less than a year after M.R. left Hungary (and began his Hague Convention efforts in August 2025 through the U.S. State Department).

a custodial parent sexually abuses the child." Friedrich, 78 F.3d at 1069 (quoting 51 Fed. Reg. at 10510). "If the other parent removes or retains the child to safeguard [the minor] against further [sexual] victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition" due to the intolerable situation that would arise if return was ordered. Id. (quoting 51 Fed. Reg. at 10510).

Relevant case law establishes that, in some circumstances, "[d]omestic abuse can provide a basis for a finding of grave risk" or an intolerable situation. Ischiu, 274 F. Supp. 3d at 350; see Loblein v. Alcaraz De Ens, No. 3:25cv737, 2026 WL 1507405, at *11-12 (E.D. Va. May 29, 2026) (finding a grave risk based on multiple types of abuse, including repeated acts of domestic violence against the mother in the presence of the children, hitting the children and striking them with a stick or belt, as well as a "troubling pattern of sexually inappropriate behavior in the children's presence"). A "clear history of spousal abuse" occurring in a child's presence can satisfy Article 13(b) where the case-specific facts reveal a degree of severity and repetition that presents "a grave risk of future harm to the child's wellbeing." Hundur v. Hundur, No. 1:25cv1496, 2026 WL 1004262, at *5 (E.D. Va. Apr. 14, 2026) (emphasis added). In cases of domestic abuse, federal courts have often considered whether a victim demonstrates that the abuser has an overall "propensity for

violence," Van De Sande, 431 F.3d at 570, as can be evidenced by physical assaults of other people, death threats, aggressive conduct while under the influence of alcohol or other substances, or other acts suggesting that the transfer of violence toward a child is likely in the future, see, e.g., Walsh, 221 F.3d at 219-20; Souratgar, 720 F.3d at 105. At bottom, the proper focus always remains on "whether the child would suffer upon return, not the parent." Ischiu, 274 F. Supp. 3d at 351.

**2. Discussion**

Applying the above concepts to the facts of the instant case requires careful consideration of the evidence introduced at trial, including testimony, photographs documenting instances of spousal abuse during the parties' cohabitation, and various translated documents related to prior proceedings in Hungary.

As explained in the Factual Findings recounted above, this Court found much of Respondent's trial testimony to be credible. However, Respondent, like Petitioner, has not fully taken responsibility for her contribution to the conflict in the spousal relationship, and her testimony presents a biased and at times exaggerated account of the relevant events. While this Court credits Respondent's consistent position that she genuinely intended to return to Hungary in July of 2025 and in the months that followed, this finding undercuts the credibility of her contention that a grave risk of harm or intolerable situation

awaited M.R. if he returned to Hungary in the late fall or winter of 2025 (or today).

As for Petitioner's credibility, the Court likewise found portions of Petitioner's testimony credible, but remains deeply troubled by Petitioner's refusal to admit that he physically "abused" Respondent on any occasion during their cohabitation. That said, the objective evidence plainly demonstrates that by the fall of 2023, the cohabitation and the physical abuse both ended.[16] Though each party withheld M.R. from the other in late 2023, once the Hungarian custody order took effect in February 2024, there is no evidence demonstrating that either parent improperly withheld M.R. from the other for the next sixteen months, beyond Petitioner's hours-late dropoffs of M.R. at school. This post-custody-order period appears to have been marred by the parents severe mutual mistrust, but it still offers compelling evidence of Petitioner's substantial compliance with the court-ordered shared custody arrangement as well the active involvement of the Hungarian Guardianship Authority in protecting M.R.'s best interests.

As of late June 2025, by Respondent's own sworn testimony, there was not any precipitating event causing her to "flee" an intolerable situation; she left Hungary with the intent to return.

[16] The Court places little emphasis on the alleged hard arm squeeze at the train station in November 2023, and no further physical altercations occurred during the eighteen months immediately preceding M.R.'s departure from Hungary.

Though Respondent attests that she was in the process of seeking a modified custody order in Hungary in or around June 2025, there is no evidence suggesting that she was doing so with any urgency, and Respondent points to no risk of harm to M.R. that was "something greater than would normally be expected on taking a child away from one parent." Walsh, 221 F.3d at 218. Tellingly, even after Respondent left the country with M.R., she attempted to return the child to Hungary.

Only months later did Respondent subjectively decide that it was too risky to go back at all, but such decision was not triggered by any event that credibly suggests an elevated risk to M.R.'s physical or psychological well-being upon return. Surely, M.R.'s life will now be disrupted in the short term by a return to Hungary, and such disruption will likely bring with it negative side effects arising from M.R.'s medical diagnoses. But the record does not demonstrate a "grave risk" or "intolerable situation" likely to result from a return to Hungary or a return to Petitioner's lawful custody.[17] Rather, the most likely negative circumstances and adjustment challenges will flow from the fact that M.R. was not returned to Hungary in the summer of 2025, and like any very young child would, M.R. has become accustomed to the new surroundings and uninterrupted care from a single caregiver. The need to adjust

[17] The fact that the United States may provide better access to medical or psychological treatment, or better schooling, is likewise insufficient to satisfy Respondent's burden. Cf. Friedrich, 78 F.3d at 1068.

back to a life of shared custody in the child's true country of domicile is simply not a valid basis to deny the return Petition. See Ischiu, 274 F. Supp. 3d at 350 (explaining why an abducting parent is generally precluded from relying on the negative psychological impact "associated with uprooting and moving the child back to the country of habitual residence"); Cuellar v. Joyce, 596 F.3d 505, 511 (9th Cir. 2010) ("The fact that a child has grown accustomed to her new home is never a valid concern under the grave risk exception, as 'it is the abduction that causes the pangs of subsequent return.'" (quoting Friedrich, 78 F.3d at 1068)); cf. Madrigal, 848 F.3d at 677 ("[T]he possible separation of a child from [an abducting] parent is not sufficient to trigger the grave risk of harm exception.").

The historical physical abuse of Respondent, which ended three years ago, also falls short of demonstrating a grave risk to M.R., or an intolerable situation, as M.R.'s parents have no intention of living together in the future. Additionally, the record fails to even suggest that Petitioner assaulted other individuals or that he has a propensity for violence outside of the terminated marital relationship. It would therefore be against the weight of the evidence to conclude that future physical abuse of Respondent in the child's presence is likely. See Navarro Parra v. Villalonga Camargo, 777 F. Supp. 3d 674, 687 (N.D. Tex. 2025) ("[W]hen the parents' current living situation makes cohabitation

unlikely and therefore recurring spousal abuse witnessed by the child unlikely, there is no grave risk of harm."); Hundur, 2026 WL 1004262, at *5 ("Perhaps most significantly, there is no indication that the [spousal] abuse will continue in the future" as the parents "are in the process of getting divorced" and "the evidence indicates that any threat to [the child's] wellbeing is largely eliminated when the two are not attempting to co-parent as a couple"). The record falls even shorter of suggesting that M.R. will be physically or emotionally abused by Petitioner in the future. Accordingly, Respondent fails to demonstrate by clear and convincing evidence that the narrow 13(b) exception applies in this case.

To put a finer point on this conclusion, which can feel dissatisfying in the face of proven pre-separation spousal abuse, the Court acknowledges that "[r]easonable people may debate whether the 'grave risk' standard is sufficiently sensitive to legitimate claims of abuse, without being over-sensitive to false or exaggerated claims." Khan v. Fatima, 680 F.3d 781, 792-93 (7th Cir. 2012) (Hamilton, J., dissenting). At trial, Respondent's expert Dr. Edleson revealed his apparent agreement with "advocates[] and scholars[]" who opine that the grave risk standard is too difficult to satisfy for victims of domestic violence.[18]

[18] Dr. Edleson's testimony was helpful to the resolution of this case, but the Court did not find all of his conclusions to be convincing as they were grounded in a somewhat one-sided view of the relevant facts.

Id. While it may be tempting to adopt this scholarly position and be drawn into deciding the perceived "best interests of the child" after finding that past spousal abuse is substantiated, id. at 789, acceding to this temptation ignores the statute and treaty that this Court must follow to faithfully execute its foundational obligation to uphold the rule of law. Embedded in the concept of the rule of law is that countries have a duty to abide by their obligations to comply with international conventions to which they are signatories. Cf. Golan, 596 U.S. at 670 (explaining that the Hague Convention's "prompt return" requirement "ensure[s] that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." (quoting Hauge Convention art. 1(b)) (alteration in original)). Violating this Court's duty to honor the terms of international conventions would not only disregard the rule of law, but would also contradict the "basic premise of the Hague Convention" which is "to protect the best interests of all children by removing the incentive to abduct children involved in custody disputes . . . ." Khan, 680 F.3d at 790 (Hamilton, J., dissenting) (emphasis added); see Lozano, 572 U.S. at 5 ("[T]he Convention's central operating feature is the return of the child." (quotation marks omitted)).

Here, even if this Court believed that the "grave risk" exception as applied under ICARA's "clear and convincing" standard has been too narrowly applied in certain spousal abuse cases, this

Court would reject the defense here based on the unique case-specific facts. Critically, considering M.R.'s joint-custody situation in June 2025 involving parents that had not cohabitated for nearly two years, the absence of any physical abuse or any "abductions" by either parent for nearly a year and a half, the entry of a Hungarian joint custody order that was being materially followed by both parents, and the entry of a Hungarian Guardianship Authority order that required therapy for the child and both parents, there is simply no "clear and convincing" evidence that M.R. will suffer grave, more than serious, physical or psychological harm if returned to a similar arrangement in Hungary.[19]

This is simply not a case where in the face of an intolerable living situation marred by spousal abuse or threats of future violence the victim parent flees the country with the child "to safeguard [the minor] against further victimization." Friedrich, 78 F.3d at 1069 (quoting 51 Fed. Reg. at 10510). Instead, Respondent has repeatedly asserted under oath that she temporarily left Hungary with M.R. with every intention to return. This is

[19] Though a custody court could surely find that Respondent is a "better" parent with a stronger bond to M.R., such custody consideration has little relevance to the case before this Court. For example, this Court notes its consideration of video exhibits from March and April of 2024 revealing that M.R., still only three at the time, did not want to be picked up by Petitioner. Resp't Exs. 11, 12. While the videos and related testimony plainly reveal a toddler's parental preference, they fall far short of demonstrating that M.R.'s relationship with Petitioner created a grave risk to M.R. or an intolerable situation that would support Respondent's unilateral decision to relocate M.R. to the United States.

powerful evidence of her contemporaneous subjective belief that, while the shared-custody situation was far from harmonious, and while she subjectively continued to "fear" and mistrust Petitioner and wished to expand her custody rights, the situation was something less than "grave" or "intolerable," particularly as more time passed since Petitioner's last alleged "abduction" of M.R.

Respondent, of course, later changed her mind, but she does not advance clear and convincing evidence that would support the objective finding that Petitioner is likely to harm or illegally seize M.R. and cause psychological harm if M.R. is returned. Tellingly, there is no evidence that Petitioner made any post-departure threats of violence; planned to "snatch" the child in the United States or in Hungary;[20] engaged in any other illegal behavior; or even pursued any new course of malicious rhetoric over email or text. Compare Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 401 (E.D.N.Y. 2005) (documenting the father's repeated threats of severe harm toward the mother and her family made after she retained the children in the United States). What the record does include is evidence that Petitioner repeatedly emailed Respondent trying to convince her to return M.R. on his terms (rather than hers), pursued legal changes to the Hungarian custody order, pursued voluntary return through the legal avenue of the

[20] Petitioner knew of M.R.'s whereabouts in the United States in July 2025, and again during the pendency of this case, and he presumably could have traveled to the United States as he did for the bench trial.

Hague Convention, secured an appellate court order in Hungary instructing Respondent to return with M.R., and ultimately, when all of these lawful pursuits failed, filed the instant case in a United States District Court. While this Court does not discount the possibility that Petitioner could unlawfully withhold M.R. from Respondent once M.R. is returned to Hungary, (1) Petitioner has materially followed the Hungarian custody order since February 2024, (2) the risk that he will blatantly ignore a lawful custody order is reduced following the bright spotlight the divorce proceedings and this Hague Convention proceeding has shined on the parties' conduct, and (3) Petitioner should be readily aware that future actions in contravention of the custody order could lead to the loss or reduction of Petitioner's own custody rights. Accordingly, Respondent's subjective fears, while understandable, are simply insufficient to support a valid Article 13(b) defense.

* * *

In summary, Petitioner has plainly carried his burden to prove wrongful retention by a preponderance of the evidence. Respondent, for her part, has demonstrated instances of spousal abuse during her cohabitation with Petitioner and that Petitioner previously withheld M.R. from her before a formal Hungarian custody order was in place. However, in light of the events occurring after the custody order was entered, Respondent has failed to demonstrate by clear and convincing evidence that there is an existing "grave"

risk that M.R. will suffer physical or psychological harm, or be placed in an "intolerable situation," if returned to Hungary and raised jointly, but separately, by two parents living apart. To be sure, the situation may, at least initially, be "worse" than the child's current situation and may cause M.R. emotional setbacks after spending so much uninterrupted time with Respondent and away from the verbal arguments jointly engaged in by Petitioner and Respondent. But this harm is the result of the wrongful retention itself, the length of time that M.R. has been kept away from Hungary, Respondent's refusal to follow the Hungarian Court's return order, and both parents' past failures to put M.R.'s well-being first and avoid verbal confrontations in the young child's presence.

Upon M.R.'s return to Hungary, it will be up to both parents to take the hard steps necessary to avoid resuming their interpersonal verbal conflicts, which unmistakably undercut M.R.'s best interests. Both parents are thus encouraged to follow the repeated recommendations of the Hungarian courts and Guardianship Authority to place their personal differences aside and focus on providing a predictable environment for M.R. where the child's interest are always paramount.

Though this Court rules in Petitioner's favor, it finds that Respondent's decisions since June 2025 have been misguided, not malicious. The Court hopes that both Petitioner and the Hungarian

courts continue to recognize M.R.'s robust emotional bond with Respondent, which earlier this year caused the Hungarian appellate court to sagely state as follows: "[T]he child ha[s] been living with the [mother] for months, therefore, it is [in] the child's best interest to keep spending time with the [mother] on a regular, extensive, and predictable basis." Pet'r Ex. 30, at 10.

**IV. Return Order**

For the reasons articulated above:

1. Petitioner Tamas Rottenhoffer's Amended Petition for Return of Minor Child M.R. to Hungary, ECF No. 6, is **GRANTED**.

2. **On or before September 22, 2026**, Respondent **SHALL surrender custody** of the minor child, M.R., to Petitioner for return to Hungary. Counsel for Petitioner shall coordinate turnover arrangements with Respondent, and turnover **SHALL** occur at a local supervised visitation center or at a local police station approved for custody transfers. Respondent **SHALL** bring and turn over to Petitioner M.R.'s medications as well as any medical, educational, or other treatment records that will assist in M.R.'s reintegration to life in Hungary.

3. Respondent **SHALL, as soon as practicable, execute** any temporary travel document (U.S. or Hungarian) that is needed to facilitate M.R.'s return travel to Hungary with Petitioner.

4. Based on Petitioner's stipulation to voluntary conditions of turnover, the following are Ordered:

a. M.R. will return to Hungary on a specified itinerary with M.R.'s travel, identity, medical, educational, and treatment records;

b. Petitioner will maintain a residence in Hungary separate from Respondent and will communicate with Respondent regarding M.R. only in writing or through counsel except in an emergency;

c. Future exchanges of M.R. shall occur through school, a neutral third party, or a Hungarian child-welfare/contact service pending further Hungarian order;

d. Petitioner will not initiate in-person contact with Respondent outside scheduled child exchanges or court proceedings, with the exception of contact necessary in the United States to facilitate the execution of this Order;

e. Petitioner will provide advance notice to the competent Hungarian family court and child-welfare authority of the return date so that prompt interim proceedings may occur;

f. Petitioner shall not oppose Respondent's immediate application in Hungary for a protective order, custody order, treatment order, or supervised-contact relief;

g. Petitioner will not disparage Respondent to the child or discuss this litigation with M.R.;

h. Prescribed medications and current treatment records will accompany the child to Hungary, and Petitioner will cooperate in scheduling prompt follow-up care; and

i. The foregoing measures will expire upon the earliest superseding order of a competent Hungarian court.

5. Petitioner's counsel **SHALL NOTIFY** this Court and Respondent of the travel arrangements made for M.R. so that Respondent can, if applicable, take whatever steps necessary to facilitate her own return to Hungary. In the event that Petitioner

faces difficulty arranging travel plans or time away from his employment such that Petitioner desires a "turnover" date after September 22, 2026, Petitioner may file a motion with this Court seeking a brief extension of this deadline.

6. Petitioner's counsel may immediately retrieve M.R.'s expired passport from the Clerk of Court as such document may assist in travel arrangements or future passport renewal.

7. **After** M.R. has been transferred into Petitioner's custody, counsel for Petitioner **SHALL** immediately notify the Clerk's Office of this Court. Upon receiving such notification, the Clerk's Office shall release Respondent's own passport to her. The Court's prior temporary injunction limiting Respondent's and M.R.'s travel will be terminated, **effective at the date and time of M.R.'s transferred physical custody**.

8. Petitioner's counsel **SHALL** notify the Court when M.R.'s return to Hungary is completed.

9. Petitioner **SHALL** be afforded **twenty-one (21) days** to file a motion seeking necessary expenses, including legal fees and transportation costs related to M.R.'s return. 22 U.S.C. § 9007(b)(3). The Court, however, encourages Petitioner's counsel to discuss this matter with Respondent prior to filing a motion in order to determine whether a stipulated resolution can be reached due to (1) the potential impact of Respondent's limited financial

means on the fee-shifting provision, and (2) the related future impact on M.R. while in Respondent's custody.

The Clerk is **DIRECTED** to enter judgment accordingly, to provide copies of this Opinion and Order to Petitioner's counsel and to Respondent, and to close the case. Though the case will be closed, the Court retains jurisdiction to ensure compliance with this Opinion and Order.

**IT IS SO ORDERED.**

/s/ MSD
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September 11, 2026